## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

LUIS BULTRON,                          )
                                       )
            Petitioner,                )
                                       )
    v.                                 )         Civ.Act.No. 06-708-GMS
                                       )
THOMAS CARROLL, Warden                 )
and JOSEPH R. BIDEN, III, Attorney     )
General for the State of Delaware      )
                                       )
            Respondents.               )

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. §
2254, respondents state the following in response to the petition for a writ of habeas
corpus:

In October 2004, the petitioner, Luis Bultron, was convicted in a Delaware
Superior Court jury trial of second degree burglary and misdemeanor theft. (Superior
Court Criminal Docket #0403006285, D.I. 15). Bultron was thereafter sentenced, as a
habitual offender, to a term of eight years imprisonment, the minimum permitted under
Delaware law. *Bultron v. State*, 897 A.2d 758, 762 (Del. 2006) (*Bultron II*). On appeal,
the Delaware Supreme Court affirmed Bultron's convictions and sentence. *See Bultron
II.*

The crux of Bultron's claim lies in his actions towards his court appointed
counsel, Edmund Hillis, Esq.  Hillis, an Assistant Public Defender, was assigned to
represent Bultron while Bultron's charges were pending in the Court of Common Pleas.
*State v. Bultron*, 2005 WL 159619 at *1 (Del. Super. 2005) (*Bultron I*) (Exhibit A).

1

"During the final case review, the State offered a plea agreement calling for Bultron to admit that he was subject to sentencing as a habitual offender under 11 Del. C. §4214(a), and the State promised to recommend eight years in prison under the habitual offender statute." *Bultron I* at *1. Hillis, believing that the State's case was strong and that Bultron was likely to be convicted, recommended that Bultron accept the State's offer. *Id.* at 2. Bultron declined to do so, and "took [Hillis' advice] as a sign that Hillis believed Bultron was guilty and that Hillis would not extend his best effort on Bultron's behalf at trial." *Id.* Hillis tried to convince Bultron that he would defend Bultron to the best of his ability but Bultron "remained unconvinced." *Id.*

Bultron began expressing his discontent with Hillis in a hearing before Superior Court in September 2004. *Id.* "Bultron complained that Hillis had not subpoenaed witnesses Bultron believed would help his defense." *Id.* Bultron's distaste for Hillis next arose in October 2004, shortly before Bultron's jury was selected:

> Hillis asked to approach the bench before jury selection and disclosed Bultron's ongoing abuse. Hillis said:
>
> My client had an application to proceed *pro se.* He's very adamant about it. He's been very derogatory to me, including such phrases as you fat fuck. He wants to proceed *pro se.* I would love for you to grant that motion. He's not cooperating with me, he won't listen to me. He has been reading me rules of the Superior Court about ineffective assistance of counsel while the jury panel is in the room.
>
> The trial judge instructed counsel that because the request for self-representation was untimely and disruptive, it would be heard after jury selection. Bultron asked to be heard and the jury array was escorted out of the courtroom. Bultron told the trial judge he wanted substitute counsel and that he did not ask to represent himself. The trial judge told Bultron the issue would be addressed after the jury was selected. Jury selection then proceeded with Hillis representing Bultron.
>
> After jury selection, the trial judge again discussed with Bultron his concerns. Bultron wanted a better plea offer which the prosecutor

declined to give. Bultron then complained about Hillis and his recommendation to accept the plea offer that was made. Hillis told the trial judge he took an oath to represent clients zealously over 20 years ago and that he would do the best that he could for Bultron at the trial. The trial judge denied Bultron's request for substitute counsel. Bultron then told the trial judge he was nauseated, and Bultron was escorted from the courtroom. Before taking a recess, the trial judge asked Hillis to meet with Bultron.

After several minutes, the court reconvened with Bultron present. Hillis reported that Bultron continued to be abusive and requested to withdraw from the representation. Hillis explained:

Our last discussion ... included accusations that I have been committed in the past to a mental hospital, a cross-examination concerning my finding of noncontempt in this Court by one of your colleagues*762 and I'm just not putting up with that. I don't think I have to. He has called me a fat fuck a number of times... he has accused me repeatedly of lying- and he has created in matters that are privileged obstacles to an efficient representation of him that have now reached a level where I don't know what to say to this jury on his behalf.

The trial judge then said:

[t]he Court is not going to allow Mr. Bultron to bully people, including his court-appointed attorney.... Mr. Bultron has no right to be personally abusive to anyone and as much as a public defender has to put up with, at times, ungrateful and uncooperative clients, there are limits to what the Court can force a public defender to withstand and, obviously, in this case, based on what Mr. Hillis has said and based on what the Court has seen and heard, Mr. Bultron has abused Mr. Hillis enough.

After hearing Bultron's denial of Hillis' claim, the trial judge continued:

I'm satisfied as the finder of fact, having heard both you and Mr. Hillis discussing this matter in Court, that I believe Mr. Hillis' version of what took place and that is abusive behavior that is simply not going to be tolerated by the Court.

Now, this is the way it is going to be, Mr. Bultron. This trial is going forward. It's not going to be continued a second time. If you think that it might be productive, I will send the jury to lunch now and let you speak to Mr. Hillis for a few moments during the lunch break to see if you and he can reach an agreement that's acceptable to both of you with respect to him continuing to be your attorney in this trial. But if you and

3

he cannot make your peace, then based on how we got to this situation, and that's been discussed at length now in Court, the Court is not going to force Mr. Hillis to be returning and the Court is not going to appoint you a new attorney and that's the way that that is going to be.

Bultron declined to speak with Hillis to make peace. The trial judge then permitted Hillis to withdraw.

*Bultron II*, 897 A.2d at 761-62. Superior Court ruled that Bultron had waived or forfeited his right to counsel through his continued abuse of Hillis and ordered that Bultron proceed *pro se. See Bultron I.* Bultron was thereafter convicted on all charges. On appeal, the state supreme court decided that Bultron had not validly waived, by his conduct, his right to counsel because complete warnings required by *Faretta v. California*, 422 U.S. 806 (1975), had not been given to Bultron. *Bultron II*, 897 A.2d at 765. Instead, Bultron, by his conduct, had forfeited his right to counsel. *Id.* at 765-66.

## Discussion

In his petition for federal habeas relief, petitioner raises a single ground for relief: that Superior Court violated his right to counsel under the Sixth Amendment to the United States Constitution by forcing him to proceed *pro se* after the Superior Court judge ruled that he had forfeited his right to counsel. Because Bultron presented this claim to the Delaware Supreme Court in *Bultron II*, it has been properly exhausted.

Bultron has failed to show that he is entitled to relief on the merits. As explained by the Third Circuit, a federal court's consideration under §2254(d)(1) of a habeas petitioner's claim proceeds in two steps. The court "must first identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000). *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). To do so, "it is not sufficient for the petitioner to show merely that his

4

interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome." *Werts*, 228 F.3d at 197. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."). Thus, if the Supreme Court has not established "a clear or consistent path" of jurisprudence for state courts to follow, the prisoner is not entitled to relief. *Lockyer*, 538 U.S. at 72. When looking to Supreme Court precedent, the court "must decide the level of specificity at which [it] decide[s] whether the state decision is contrary to, or unreasonably applies, that precedent. . . . Supreme Court jurisprudence addressing §2254(d)(1) has established that determining the 'clearly established' benchmark should be done on a case-specific level." *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004). Under §2254(d)(1), "the Court views its precedents in their particular factual settings. The touchstone precedents are not to be examined by looking to broad pronouncements or generative principles in the opinion. The 'materially indistinguishable' test presupposes a fact-specific analysis of the Supreme Court case law." *Fischetti*, 384 F.3d at 148 (citing cases).

"If [the court] determine[s] that the state court decision is not 'contrary to' the applicable Supreme Court precedent, then [the court is] required to advance to the second step in the analysis -- whether the state court decision was based on an 'unreasonable application of' Supreme Court precedent." *Werts*, 228 F.3d at 197. In performing this inquiry, the court is "not authorized to grant habeas corpus relief simply because [it] disagree[s] with the state court's decision or because [it] would have reached a different result if left to [its] own devices." *Werts*, 228 F.3d at 197. Instead, the state court's

application of Supreme Court precedent must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Werts*, 228 F.3d at 197. And as with the inquiry under the "contrary to" prong of the statute,

"in analyzing habeas claims for unreasonable application of the law, the Supreme Court has looked at its own baseline precedents through a sharply focused lens." *Fischetti*, 384 F.3d at 149. The decisions of state and lower federal courts are relevant in assessing the reasonableness of the state court decision at issue, but "cases not decided by the Supreme Court do not serve as the legal benchmark against which to compare the state decision." *Fischetti*, 384 F.3d at 149. Finally, in this context, Supreme Court precedent involving the interpretation of federal statutes is not enough; the relevant body of decisional law is that interpreting the federal Constitution. *Early v. Packer*, 537 U.S. 3, 10 (2002) (Court's holdings on non-constitutional issues are not "relevant to the §2254(d)(1) determination"); *Johnson v. Carroll*, 369 F.3d 253, 259-62 (3d Cir. 2004).

In the first instance, there are no Supreme Court decisions involving forfeiture of the right to counsel. *Wilkerson v. Klein*, 412 F.3d 449, 455 (3d Cir. 2005); *Fischetti*, 384 F.3d at 150. And as the Third Circuit observed in *Wilkerson* (412 F.3d at 455) and *Fischetti* (384 F.3d at 152), the Supreme Court has not clearly defined the standard to be applied before the trial court can decide the defendant has forfeited the right to counsel. But the Supreme Court has indicated in *Illinois v. Allen*, 397 U.S. 337 (1970), and *Taylor v. United States*, 414 U.S. 17 (1973), that state courts can conclude that "certain objectionable conduct" by the defendant can amount to a forfeiture of the right to counsel. *Wilkerson*, 412 F.3d at 456 (*citing Fischetti*, 384 F.3d at 151); *Bultron II*, 897 A.2d at 766 n. 21.

6

In Bultron's case, the state supreme court reasonably applied Supreme Court precedent. The right to counsel does not guarantee a criminal defendant the absolute right to the counsel of his choice. *Wheat v. United States*, 486 U.S. 153, 159 (1988). *See United States v. Moses*, 58 Fed.Appx. 549, 555 (3rd Cir. 2003). Nor does the Sixth Amendment guarantee a meaningful relationship between counsel and the accused. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Mere dissatisfaction with appointed counsel, first divulged on the eve of trial, is not enough to justify substitution of appointed counsel. *Moses*, 58 Fed.Appx. at 555.

Substitution of counsel should only be ordered for good cause. "Good cause for substitution of counsel is defined as a 'conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney.'" *Moses*, 58 Fed.Appx. at 555, *quoting United States v. Goldberg,* 67 F.3d 1092, 1098 (3d Cir.1995). Bultron, in the instant case, evinced no good cause to justify the removal of Hillis and substitution of new counsel. *Bultron II,* 897 A.2d at 763. Rather, the Delaware Supreme Court held that no good cause existed to replace Hillis. *Id.* at 766. Accordingly, the Delaware Supreme Court ruled that Superior Court had not erred in denying Bultron's request for substitute counsel. *Id.* Thus, faced with the Superior Court's proper refusal to appoint substitute counsel, Bultron was left with two choices: cooperate with Hillis or proceed *pro se*. Bultron's behavior towards Hillis, however, forfeited any right he had to Hillis' services.

Bultron, through continued abuse of Hillis, forfeited his rights under the Sixth Amendment. "Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's

knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *Goldberg*, 67 F.3d 1092, 1100 (3rd Cir. 1995). And the federal courts of appeals have concluded that a defendant's abuse of his attorney can warrant the forfeiture of the right to counsel. Thus in *United States v. McLeod*, 53 F.3d 322, 325 (11th Cir. 1995), Jackie McLeod, on trial for retaliation against a witness, fired his first attorney. *Id.* at 325. McLeod's second attorney, Bridges, moved to withdraw after McLeod threatened to sue him and suggested that his attorney suborn perjury in a telephone call. *Id.* The District Court granted Bridges' motion to withdraw and refused to appoint another attorney, ruling that McLeod had forfeited his right to counsel. *Id.* at 326. The Eleventh Circuit agreed, effectively ruling that McLeod's verbal abuse was sufficient to forfeit the right to counsel. *Id.* Along similar lines, the Third Circuit decided in *United States v. Thomas*, 357 F.3d 357 (3d Cir. 2004) that the defendant's verbal abuse of counsel meant that the defendant had forfeited his right to counsel. 357 F.3d at 363.

Bultron, in the instant case, called his attorney a "fat fuck" on a number of occasions, accused Hillis of having been committed to a mental hospital, and accused Hillis of lying multiple times. *Bultron II*, 897 A.2d at 762. Further, Bultron implicitly threatened Hillis with a disciplinary complaint by "reading [Hillis] the rules of the Superior Court about ineffective assistance of counsel while the jury panel [was] in the room." *Bultron II*, 897 A.2d at 761. Bultron was warned, on multiple occasions that his behavior could lead to the loss of his Sixth Amendment rights. *Bultron II*, 897 A.2d at 765; *Bultron I* at *3. The Delaware Supreme Court held that Bultron's conduct was sufficiently egregious to effectively forfeit his right to counsel. Because the Delaware

8

Supreme Court's decision was a reasonable application of Supreme Court precedent, Bultron's claim before this Court must be rejected.

## Conclusion

Based upon the Superior Court docket sheet, it appears that transcripts of Bultron's jury trial and sentencing have been prepared. In the event that the Court directs the production of any transcript, respondents cannot state with specificity when such transcript would be available. However, respondents reasonably anticipate that such production would take 90 days from the issuance of any such order by the Court.

/s/ James T. Wakley
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 4612

DATE: March 30, 2007

Westlaw.

Not Reported in A.2d                                                                      Page 1

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
State v. BultronDel.Super.,2005.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
STATE of Delaware
v.
Luis BULTRON, Defendant.
Jan. 21, 2005.

Stephen Walther, Deputy Attorney General.
Department of Justice, Wilmington, DE, Deputy
Attorney General for the State Luis Bultron,
Delaware Correctional Center, Smyrna, Delaware,
Defendant, pro se.

POST-TRIAL AND SENTENCING
MEMORANDUM
SILVERMAN, J.
**\*1** At the court's insistence and over Bultron's
objection, the court required Bultron to represent
himself at trial. This was despite the fact that
Defendant was eligible for sentencing as a habitual
offender. The court's uncharacteristic decision and
the drastic circumstances leading up to it justify
formal discussion, beyond the contemporaneous
record. Therefore, this summarizes and supplements
the extensive bench rulings made before and during
the jury trial on October 5-6, 2004 and at
sentencing on January 7, 2005.

In summary, the court forced Defendant to stand
trial *pro se* because Defendant mistreated his
court-appointed attorney to the point that the
attorney, one of Delaware's most seasoned criminal
defense lawyers, asked to withdraw. During
extensive hearings on September 21, 2004 and after
jury selection on October 5, 2004, the court
determined that Defendant's misconduct amounted
to a waiver or forfeiture of his right to
court-appointed counsel. Based on that finding, the
court forced Defendant, against his expressed

desires, to represent himself at his jury trial.

I.

The New Castle County Grand Jury indicted
Defendant on April 5, 2004 for Burglary second
degree, Theft misdemeanor, and Unlawfully
obtaining possession of a controlled substance.
Before trial, the State dropped the drug offense.
Even before the indictment was handed up, while
the case was pending in the Court of Common
Pleas, the Public Defender was appointed to
represent Mr. Bultron. And before the indictment,
the Public Defender assigned one of his most
experienced Assistant Public Defenders, Edmund
Hillis, Esquire.

Almost immediately after he was assigned, Hillis
filed a motion for reduction of bail; the case had
moved to Superior Court by then. Meanwhile, on
April 5, 2004, the State served Hillis with the
discovery called for by Superior Court Criminal
Rule 16(d)(4).

Consistent with the New Castle County Criminal
Case Management Plan, Defendant and Hillis
appeared for arraignment and first case review on
May 3, 2004. Because the case was not resolved
during the first case review, the court scheduled a
second and final case review for May 24, 2004.
During the final case review, the State offered a
plea agreement calling for Bultron to admit that he
was subject to sentencing as a habitual offender
under 11 *Del. C. § 4214(a)*, and the State promised
to recommend eight years in prison under the
habitual offender statute.

The court has determined that Bultron was willing
to plead guilty to Burglary second degree as the
State demanded, but Bultron insisted that the State
should, in effect, waive sentencing under the
habitual offender statute and recommend no more
than three years in prison. Otherwise, had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex A

Not Reported in A.2d                                                                 Page 2

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Defendant pleaded guilty to the burglary and if the State filed a petition, as it intended, the court would have been obligated by law to sentence Defendant to no less than eight years in prison and, perhaps, as much as life.[FN1]

> FN1. 11 *Del. C. § 4214(a)*; 11 *Del. C. § 825*.

**\*2** The State's position was not lenient, but taking the case and Bultron's record into account, it was understandable. In any event, the State would not come down. It insisted on an eight year sentence, and the final case review left the case unresolved. Accordingly, after the parties announced at the final case review that there would be no plea agreement, the court issued an order scheduling trial for September 2, 2004.

Apparently, sometime before the scheduled trial date, Hillis suggested to Bultron that accepting the State's plea offer was in Bultron's best interest. In part, to explain his recommendation, Hillis told Bultron that the State's evidence was strong, which it was; and that it was likely Bultron would be convicted, which was a reasonable assessment. Instead of taking Hillis's views as sound advice from an experienced lawyer, Bultron took it as a sign that Hillis believed Bultron was guilty and that Hillis would not extend his best effort on Bultron's behalf at trial. On several occasions, some of them on the record, Hillis assured Bultron that Hillis had no opinion about Bultron's guilt or innocence and Bultron's guilt or innocence was "irrelevant" to Hillis. Hillis tried to assure Bultron that Hillis would carry out his duty to represent Bultron to the best of his ability. Bultron, for whatever reason, remained unconvinced.

For unknown and unimportant reasons, the trial was rescheduled from September 2, 2004 until September 21, 2004. Most likely, the rescheduling had to do with the attorneys' schedules or the court's crowded docket. In any event, the case was rescheduled.

As it turned out, on September 21, 2004, the court held a hearing, rather than the scheduled trial.

Bultron announced his dissatisfaction with Hillis. In the process, Bultron complained that Hillis had not subpoenaed witnesses Bultron believed would help his defense. Although the court expressed willingness to force the matter to trial on September 21, 2004, the State demurred to the defense request for more time. Accordingly, the court rescheduled the trial for October 5, 2004.

On October 5, 2004, as a matter of course, the court summoned a petit jury panel. When the court arrived for jury selection at 10:05 a.m., Hillis asked to approach the bench. At sidebar, Hillis advised the court that Bultron was dissatisfied with Hillis and that Bultron wanted other legal representation. The court denied the request, holding that it was untimely and disruptive. The court stated that jury selection would proceed, but the court would hear Bultron immediately after jury selection.

The court selected a petit jury without incident. Hillis participated in *voir dire* at sidebar. As the jury was drawn, Hillis and Bultron quietly conferred. Hillis exercised five of Defendant's six, preemptory challenges. The defense also struck an alternate. After the jury was seated and sworn, the court sent the jury out and asked Bultron about his dissatisfaction with Hillis.

**\*3** While the jury waited, the court carefully reviewed Bultron's complaints about Hillis. Basically, Bultron was dissatisfied because Hillis was unable to convince the State to recommend three years in prison, rather than eight years. And Bultron was upset because, as discussed above, Bultron believed Hillis thought Bultron was guilty. Bultron also told the court that he disagreed with Hillis's refusing to bring to the jury's attention Bultron's questionable mental state when Bultron was arrested.

During an extensive colloquy, including Bultron, Hillis and the prosecutor, the court insisted that the prosecutor explain why the State was adamant about its plea offer. Although the court's insistence was overreaching, the State complied without protest. The court and Hillis also addressed Bultron's belief that Hillis thought Bultron was guilty and the court explained, with some help from Hillis, why it would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 3

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
(Cite as: Not Reported in A.2d)

be unwise to put Bultron's mental condition in front of a jury. Bultron remained unmoved. He insisted that Hillis was unacceptable and Bultron demanded new counsel.

During the hearing, Hillis advised the court that Bultron had been abusive. Hillis said that Bultron had called Hillis offensive names and Bultron had " cross examined" Hillis rudely. For example, Bultron wrongly suggested that Hillis had once been committed to a mental institution. Bultron did not deny what Hillis told the court.

On that note it is appropriate to reiterate that Hillis is one of the most senior attorneys in the Public Defender's Office and one of Delaware's most experienced defense attorneys. The Delaware Bar is relatively small and the criminal defense bar is even smaller. Hillis is well known to the court and he is highly regarded. He not only is considered by most to be experienced and aggressive, he is effective. While Hillis's clients occasionally find his direct style off-putting, Hillis is notoriously tenacious and his loyalty to his clients is beyond question.

In any event, abusive clients are *scènes à faire* for public defenders. And Hillis initially took Bultron's abuse in stride. The court, for its part, tried to soften Bultron's hard feelings. The court also made it clear to Bultron that if Hillis was unacceptable to Bultron, the court would consider allowing Bultron to represent himself or it would force Bultron to represent himself. The court, however, was firm that it would not attempt to appoint counsel more to Bultron's liking. The court also was emphatic that it would not continue the trial a second time, after a jury had been selected.

As the jury continued waiting, the court finally encouraged Bultron and Hillis to meet privately in the holding area outside the assigned courtroom. After several minutes, the court reconvened and Hillis announced that Bultron continued to be abusive and that for the first time in twenty-five years, Hillis was asking to be relieved of his duty to represent a client. The court told Hillis that it would allow him to withdraw. At the same time, the court again warned Bultron that if Hillis withdrew, the court would not appoint a new attorney for Bultron.

Nor would the court continue the trial, again. Accordingly, if Hillis withdrew, Bultron would be forced to represent himself. Again, the court suggested that Bultron meet with Hillis to see if they could work things out. Bultron ignored the court's entreaty, continuing to insist that he had a right to counsel, and so on. In response, the court made good on its word and it excused Hillis from further participation in the trial. Hillis left the courtroom. Bultron did not ask that Hillis remain as stand-by counsel. And considering their history, that request would have been surprising and senseless.

*4 Thereafter, Bultron behaved civilly in front of the jury.[FN2] Out of the jury's presence, however, Bultron continued to argue that the court had deprived him of legal representation, against his wishes. Until the court saw no point to it and gave up, the court continued to remind Bultron that the reason why he was not represented by court-appointed counsel was because he had intimidated and abused his court-appointed counsel to the point where, for the first time in his long career, the lawyer had asked to be relieved. The court continued to remind Bultron that having browbeat one court-appointed attorney, the court was unwilling to appoint another one. Bultron was on his own, but he had no one to blame for that but himself.

> FN2. During the original dust-up over legal representation, the court held Bultron in contempt, and sentenced him for disruptive behavior. That all happened out of the jury's presence. In light of the subsequent conviction and Bultron's improved behavior, the court has vacated the actual sentence.

The trial went as expected. Bultron was unable to cross-examine the State's witnesses effectively. When the time came for Bultron to decide whether he would testify, the court laboriously explained Bultron's rights. Bultron continued to pursue the tack that he could make no decisions except on the advice of counsel, which the court had denied. Bultron persisted in his refusal to acknowledge that the court had appointed competent counsel, but due

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 4

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

to his abusive behavior Bultron had forfeited his right.

Eventually, when Bultron refused to tell the court whether he elected to testify or not, the court cautioned him that unless he announced that he wished to testify, the court would take it that Bultron had waived the right. Bultron did not testify. He gave a brief closing argument. Bultron asked the jury to consider whether the evidence established that he intended to commit a crime, theft, while he was in the dwelling and, therefore, he should be found guilty of the lesser-included crime, Criminal trespass first degree, a misdemeanor. The jury, however, found Defendant guilty as charged.

As mentioned, Bultron was sentenced as a habitual offender to eight years in prison, the minimum allowed. To ensure that Bultron's predicament does not jeopardize his important appeal rights, the court temporarily re-appointed the Public Defender for the limited purpose of perfecting an appeal. Of course, the Supreme Court will address further representation there.

## II.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy a right ... to have the Assistance of Counsel for his defense." [FN3] It is well-settled that an indigent has no right to choose his appointed counsel; appointment rests solely with the trial judge.[FN4] An accused should have "a fair opportunity to secure counsel of his choice." [FN5] The indigent defendant, however, must accept the lawyer appointed by the trial court, provided that the lawyer is "a qualified member of the Bar" and will " act diligently in the defendant's behalf." [FN6]

  FN3. U.S. Const. amend. VI; *see also Gideon v. Wainwright,* 372 U .S. 335 (1963).

  FN4. Wayne R. LaFave, Jerold H. Israel and Nancy J. King, Criminal Procedure § 11.4(a) (2d. Ed.1999).

  FN5. *Powell v. Alabama,* 287 U.S. 45, 53 (1932).

  FN6. *See e.g. Burgos v. Murphy,* 692 F.Supp. 1571 (S.D.N.Y.1988)(holding " although the Sixth Amendment guarantees an indigent the right to counsel, it does not guarantee counsel of his choice."); *Muto v. State,* 843 A.2d 696 (Del.2004).

Defendants may motion to replace appointed counsel. A last minute request, bad faith on the defendant's part, or maneuvers intended to cause delay are grounds for denying a continuance.[FN7] A court may properly deny a request for new counsel made immediately before trial.[FN8] Here, Bultron elected to wait until the day of trial, moments before jury selection, to voice his concerns about Hillis. Furthermore, he disobeyed the court's order not to address the issue until after jury selection, which resulted in the court's holding him in contempt, out of the jury's presence.

  FN7. *United States v. Rankin,* 779 F.2d 956, 959 (3d Cir.1986).

  FN8. *United States v. Laura,* 607 F.2d 52, 57 (3d Cir.1979).

*5 Once counsel has been appointed, defendant has a right to substitute new counsel only upon a showing of "good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which [could] lead ... to an apparently unjust verdict." [FN9] Good cause does not include a loss of confidence in the attorney. [FN10] Bultron expressed concern because he believed Hillis thought he was guilty. Hillis replied to the court that it did not matter what he believed, and suggested that Bultron was upset because he had been candid with Bultron when discussing the case and the likelihood of conviction. Simply put, Bultron was not entitled to a new attorney merely because Hillis opined candidly that Bultron's chances were slim. "That a criminal defendant views ... [such] frank advice as [a] prejudgement of guilt does not thereby convert good representation into good cause." [FN11]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN9. *McKee v. Harris,* 649 F.2d 927 (2d Cir.1981).

FN10. *See United States v. Young,* 482 F.2d 993 (5th Cir.1973).

FN11. *McKee,* 649 F.2d at 927.

This exception for good cause has another important caveat: the defendant cannot create "good cause" by abusive and uncooperative behavior.[FN12] In these situations, the Third Circuit Court of Appeals has affirmed where counsel withdrew, and the trial court required defendant to proceed *pro se,* on the ground that he forfeited or "waived by conduct" his right to counsel. [FN13] *United States v. Goldberg* carefully distinguishes between " waiver," "waiver by conduct," and "forfeiture." [FN14]

FN12. *See Douglas v. Warden,* 591 A.2d 399, 405 (Conn.1991)(holding: "Our courts are not, however, constitutionally required to comply with a demand for the appointment of replacement counsel on the basis of a purported conflict that arises from the unreasonable conduct of the accused himself"); *United States v. McLeod,* 53 F.3d 322, 325 (11th Cir.1995)( "a defendant who is abusive toward his attorney may forfeit his right to counsel").

FN13. *Fischetti v. Johnson,* 384 F.3d 140, 146 (3d Cir.2004); *United States v. Thomas,* 357 F.3d 357, 362-63 (3d Cir.2004); *United States v. Leggett,* 162 F.3d 237, 249 (3d Cir.1998); *United States v. Goldberg,* 67 F.3d 1092, 1100-01 (3d Cir.1995), *holding:*
"Once a defendant has been warned that he will lose his attorney if he engages in dilatory tactics, any misconduct thereafter may be treated as an implied request to proceed *pro se* and, thus, as a waiver of the right to counsel ... In many situations there will be defendants who engage in dilatory conduct but who vehemently object to being forced to proceed *pro se.* These

defendants cannot truly be said to be " waiving" their Sixth Amendment rights because although they are voluntarily engaging in misconduct knowing what they stand to lose, they are not affirmatively requesting to proceed *pro se.* Thus, instead of "waiver by conduct," this situation more appropriately might be termed "forfeiture with knowledge."
(citations omitted); *United States v. Jennings,* 855 F.Supp. 1427 (M.D.Pa.1994) , *aff'd,* 61 F.3d 897 (3d Cir.1995).

FN14. *Goldberg,* 67 F.3d at 1100-02; *But cf. United States v. Oreye,* 263 F.3d 669, 670 (7th Cir.2001); Jennifer Elizabeth Parker, *Constitutional Law-United States v. Goldberg: The Third Circuit's Nontraditional Approach to Waiver of the Sixth Amendment Right to Counsel,* 41 Vill. L.Rev.. 1173 (1996).

Since 1982,[FN15] if not sooner,[FN16] an evolving body of federal law has developed concerning waiver or forfeiture of the constitutional right to counsel. The latest case from the Third Circuit Court of Appeals, Delaware's circuit, is *Fischetti v. Johnson.*[FN17]

FN15. *United States v. Welty,* 674 F.2d 185, 188 (3d Cir.1982).

FN16. *Faretta v. California,* 422 U.S. 806, 835 (1975); *Gideon v. Wainwright,* 372 U.S. 335 (1963).

FN17. 384 F.3d 140 (3d Cir.2004).

"Waiver" requires that defendant knowingly, voluntarily, and intelligently relinquish his right to counsel.[FN18] In order for waiver to be effective, the court must engage defendant in a colloquy and explain the difficulties and dangers of proceeding *pro se.*[FN19] This is not a "waiver" case.

FN18. *United States v. Salemo,* 61 F.3d 214, 218 (3d Cir.1995); *Briscoe v. State,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 6

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

606 A.2d 103 (Del.1992).

FN19. *Faretta v. California,* 422 U.S. 806, 835 (1975); *United States v. Welty,* 674 F.2d 185, 188 (3d Cir.1982); *Watson v. State,* 564 A.2d 1107 (Del.1989).

"Waiver by conduct" occurs when defendant has been warned that he will lose his attorney if he engages in further misconduct, and defendant ignores the warning. "Any misconduct thereafter may be treated as an implied request to proceed *pro se* and, thus, as a waiver of the right to counsel." [FN20] *Goldberg* and its progeny have developed waiver by conduct. Those cases have bearing on this case's facts. In *United States v. Thomas,* the Third Circuit articulated the consequences of continued misconduct following the court's warning. [FN21] *Thomas* explained, "The purpose of a *Faretta/Welty* colloquy is to provide the defendant with notice that continued misconduct may result in the waiver of one's right to counsel; thus, we focus on whether [defendant] was warned of the possible consequences, not whether the warning immediately preceded the [trial court's] order that the defendant must proceed *pro se.* " [FN22]

FN20. *Goldberg,* 67 F.3d at 1100.

FN21. *United States v. Thomas,* 357 F.3d 357, 363 (3d Cir.2004).

FN22. *Id.* at 363.

"Forfeiture" does not require that defendant knowingly and intentionally relinquish his right to counsel; rather, it results when defendant " engage[s] in 'extremely serious misconduct,' " such as physically assaulting his appointed counsel. [FN23] No warning is necessary to trigger forfeiture. [FN24]

FN23. *Leggett,* 162 F.3d at 250, *citing Goldberg,* 67 F.3d at 1102.

FN24. *Goldberg,* 67 F.3d at 1101.

*6 The court remains satisfied that Bultron waived by his conduct and forfeited his right to counsel. After hearing Bultron and Hillis on the record, the problem between Bultron and Hillis was solely attributable to Bultron's unreasonable expectations. No good cause existed for replacing Hillis. And Bultron was warned repeatedly about the consequences of his behavior. Moreover, Bultron's bad behavior toward Hillis escalated to the point where it amounted to serious misconduct. Bultron's behavior fell short of violence or threats, but only just. Bultron's behavior was insulting and unacceptable. In effect, Bultron forced Hillis to withdraw. And the court believes Bultron probably intended that result. In any event, Bultron undeniably acted after the court warned him.

### III.

By Delaware's temperate standards, Bultron's trial was a spectacle. Bultron's meager efforts did not amount to a defense. Even so, the court strained to give Bultron an opportunity for a fair trial. The court was stymied solely by Bultron's insistence that the State, the Public Defender and the court, in turn, must meet his terms.

If Luis Bultron did not receive a fair trial on October 5, 2004, he has no one but himself to blame. The court appointed experienced counsel who tried to reason with the State and Bultron. He did what he could. The court also tried to reason with Bultron. The court rescheduled Bultron's trial once and delayed the trial after it finally began, all to give Bultron time to come to his senses. Only when it became clear that Bultron, in effect, was determined to interfere with the administration of justice did the court press on. Bultron's trial was not what is should have been, but it was the best the court could do. The court hopes it never sees another trial like Bultron's. But if another defendant, like Bultron, tries to hold his right to a fair trial hostage to unreasonable demands, the court cannot yield.

Del.Super.,2005.
State v. Bultron
Not Reported in A.2d, 2005 WL 159619

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 7

Not Reported in A.2d, 2005 WL 159619 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


(Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2007, I electronically filed the attached

documents with the Clerk of Court using CM/ECF. I also hereby certify that on March

30, 2007, I have mailed by United States Postal Service, two copies of the same

documents to the following non-registered participant:

Luis Bultron
SBI No. 00229703
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

/s/ James T. Wakley
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 4612
james.wakley@state.de.us

Date: March 30, 2007